## BOCA GRANDE CLUB, INC. v DEPARTMENT OF ENVIRONMENTAL REGULATION.

### Case No. 85-3849

State of Florida, Division of Administrative Hearings

December 19, 1986

### APPEARANCES OF COUNSEL

**Robert A. Routa** for petitioner.

**Bradford L. Thomas,** Assistant General Counsel, Department of Environmental Regulation, for respondent.

### OPINION

P. MICHAEL RUFF, Hearing Officer.

Pursuant to notice, this cause came on for administrative hearing before P. Michael Ruff, duly designated Hearing Officer, in Englewood, Florida.

This cause arose upon the application for a dredge and fill permit by the Petitioner, Boca Grande Club, Inc., seeking authorization to construct a private docking facility in conjunction with its multi-family, residential development. The facility would include a "T" shaped dock and an "L" shaped dock, which would provide 25 mooring slips. The project is to be located in the Gasparilla Sound within an aquatic preserve. The Petitioner operates an existing 58 slip marina at the same location.

On September 5, 1985, the Department of Environmental Regulation (DER) issued its Notice of Intent to Deny the sought permit. However, a copy, (and therefore notice), was not forwarded to Petitioner's counsel and on September 23, 1985, the Department issued a Final Order denying the application for the permit. On October 1, 1985, a Petition for Administrative Hearing was filed by Boca Grande Club, Inc., and those two parties agreed that the Petition for Administrative Hearing was timely filed and the Final Order was set aside pending these proceedings.

The cause came on for hearing as noticed, at the conclusion of which the Petitioner requested a transcript of the proceedings as well as the right to file Proposed Findings of Fact and Conclusions of Law, concomitantly waiving the requirements of Rule 28-5.402, *Florida Administrative Code.* The transcript in this proceeding was not filed with the parties or the undersigned Hearing Officer for nearly six months, for reasons best known to the Court Reporter, despite repeated efforts by the parties and the Hearing Officer to have this accomplished. The transcript was ultimately filed and the Proposed Findings of Fact and Conclusions of Law were timely filed under the circumstances. Those Proposed Findings of Fact and Conclusions of Law have been taken into account in this Recommended Order and additionally are addressed in the Appendix attached hereto and incorporated by reference herein.

Petitioner's Exhibits 1-20, 22-24, 26-29, and 32 were admitted into evidence. The Respondent submitted Exhibits 1-16, of which Exhibits 4, 6, 8, 9, 10, 12, 13, and 16 were admitted.

The issues to be determined concern whether the Petitioner has provided reasonable assurances that the proposed dredge and fill project will not lower ambient water quality in the Charlotte Harbor Gasparilla Sound Aquatic Preserve or violate Class II water quality

**167**

standards as defined by Rule 17-3.111 and 17-3.051, *Florida Administrative Code.* Additionally, it must be determined whether the Petitioner has provided reasonable assurances that the proposed project is clearly in the public interest as envisioned by Section 403.918(2), *Florida Statutes.*

## FINDINGS OF FACT

1. The applicant currently operates a 58 slip marina at the proposed site, which was constructed under a modified permit from the Department in 1980 by Sunset Realty. Subsequent to that construction, the Petitioner commenced its Marina Village project on uplands adjacent to the existing dock facility and entered into a lease with Sunset Realty to operate the present marina as part of its "Boca Grande Club." The operative portion of the existing marina, that is, where boats are moored and operate, is in water eight feet or greater in depth. The marina provides fuel service at a separate fuel dock as well as electric and telephone service at the individual slips, thus permitting boats using the slips to hook up to on-shore electrical and telephone service. Sewage pump-out equipment is available at the fuel dock and a portable sewage pumping facility is available to be moved to each slip as necessary. Boca Grande Club employs a full time dock master who lives aboard a boat at the existing facility. The facility presently generally serves larger craft, that is, boats generally larger than 25 feet in length and serves some vessels in excess of 60 feet in length. The marina village portion of Boca Grande Club is a condominium, residential development, which is nearly completed and will consist of 48 residential units. A second portion of the Boca Grande Club is located on the Gulf of Mexico some 2,000 feet away from the marina village. The entire project employs slightly more than 100 people.

2. The Petitioner contends that the existing marina of 58 slips is not sufficient to provide adequate dock space for the residents of the development, as well as members of Boca Grande Club. It also contends that the existing dock elevations are such as to make access from small boats to the dock difficult. The number of residents or club members requiring boat slips was not established, nor was it shown that efforts to modify existing dock elevations have been attempted unsuccessfully. In any event, the Petitioner applied to the Department on February 15, 1985, to construct the approximate 3450 square feet of additional dock facility. This would include a "T" shaped structure with an access ramp or walkway extending approximately 189 feet toward the existing channel from the shore. The waterward "T" portion will be 237 feet in length. Additionally, an "L" shaped

structure with two sections, each approximately 75 feet in length, would be constructed which would accommodate six boat slips. The "T" shaped dock will accommodate 19 boat slips at its waterward end. The docks proposed will contain ten 3' X 15' finger piers with regard to the "T" shaped dock and two 3' X 15' finger piers attached to the "L" shaped dock. The applicant would install 42 mooring pilings in the bottom of Gasparilla Sound for the mooring of boats using the docks. Thus, the applicant proposes the addition of approximately 25 boat slips with the proposed docks, all of which will be located within Gasparilla Sound, in the Charlotte Harbor Aquatic Preserve, an Outstanding Florida Water (OFW).

3. This is a Class II water body pursuant to Chapter 17-3, *Florida Administrative Code,* and has also been designed an outstanding Florida water, pursuant to Rule 17-3.041, *Florida Administrative Code.* The docking facility will be located in an area vegetated by sea grass, including turtle grass and associated algae. The access ramp for the "T" dock would be through a mangrove fringe including red, white and black mangroves. The Department' appraisal recommended denial of the application unless certain modifications to the "T" shaped dock are accomplished, including omitting the "T" shaped docking structure or relocating it to an area without grass beds; that the pilings should be driven into place rather than placed in augured holes; that turbidity screens would be installed and staked around the proposed piling site and that no boats over 25 feet in length or equipped with heads or toilets should be allowed to moore at the docking facility, nor should boats be permitted with people living aboard them.

4. On September 5, 1985, the Respondent issued its Intent to Deny indicating that the project was expected to violate water quality standards and that the construction of the dock and the presence of the moored boats attendant to use of the dock would lower existing water quality in terms of turbidity, biological integrity, bacteriological quality, especially as to fecal coliform and total coliform bacteria and based upon the DER's position that the "T" shaped dock would not clearly be in the public interest in several respects. The Department has no objection and proposes to issue a permit for construction of the smaller, "L" shaped dock.

5. In response to the Intent to Deny, the Petitioner resurveyed the seagrasses in the area and located a site where the water depths sloped to deeper water and seagrasses were sparser. It modified its application, moving the waterward extension of the dock over the deeper water in the less dense seagrasses, but could not move the dock to a location to avoid seagrass since to do so would not allow maneuvering room for

larger boats utilizing the existing dock. The applicant agreed to the other suggestions of modification by the Respondent. Thus, the applicant subsequently modified the application to include "bow-in" mooring of boats so as to place boat propellors over the deepest possible waters at the mooring site, as well as raising the central portion of the access ramp leading waterward from the shore, to provide for greater light penetration and less shading of seagrasses, as well as narrowing the dock to five feet in width where it passes through the mangrove fringe, so as to limit alteration of the mangroves at the site to only three trees. The Department continues to take the position that the permit should be denied, however, on the basis that the construction of the dock and the presence of the boats attendant to the dock will lower existing water quality in terms of the above particulars and based upon the DER's evaluation that the "T" shaped dock will not clearly be in the public interest.

## AMBIENT WATER QUALITY

6. The Petitioner tendered C.W. Sheffield, professional engineer, and Dr. Martin Roessler as experts in the field of water quality and they were accepted without objection. The respondent tendered the expert testimony of Mr. Doug Frye and William Porter, respectively a dredge and fill specialist and supervisor and an environmental specialist with the Shellfish Monitoring Program for the Department of Natural Resources, who were accepted as expert witnesses in the areas of water quality and, with regard to Mr. Porter, the impacts of water quality on shellfish. It was thus established that the ambient water quality in the cove which contains the present marina and where the proposed docking facilities would be is generally good. The water meets all relevant State regulatory standards with the exception of fecal coliform and total coliform bacteriological standards for Class II waters. In that regard, repetitive samples have shown violations of the fecal coliform and total coliform bacteriological standards for Class II waters on a number of occasions. The data relied upon concerning fecal coliform organism levels at the project site was collected and analyzed over approximately a one year period during which time the samples were shown to contain fecal coliform and total coliform bacteria in violative concentrations a number of times. Marinas are known discharge sources for fecal coliform organism. This is especially true of moored boats in marinas which often have toilets or heads which are illegally flushed into the State waters within the marina. The presence of moored boats with heads are known discharge sources of fecal coliform organisms and the boats utilizing the present marina and the proposed project do, and likely will, have toilets on board, which can be

170

improperly discharged into the waters of the marina. This marina has been established to be a source of discharge of fecal coliform organisms in violation of the relevant standard for Class II waters of the State.

7. There presently exists relatively high levels of fecal coliform organisms ranging up to 50 organisms per 100 milliliters of water in the area of the existing marina. This level of concentration exceeds the regulatory standard for fecal coliform bacteria in the Class II water quality rules. Although Mr. Porter discussed the possibility that high levels of coliform bacteria could be caused by birds or animals depositing fecal material in the water, he established that the likely source of elevated levels of this bacteria was improper operation of heads aboard boats, as pointed out by the fact that samples taken in other area of the Gasparilla Sound away from marina sites do not exhibit the high coliform levels found on repeated occasions at the subject site. Thus, it has been established that the ambient water quality is within State standards for all parameters with the exception of fecal and total coliform bacteria for Class II waters.

8. The Petitioner contends that Class III water standards are appropriately applied herein inasmuch as the Department place the Class III standards rather than the Class II standards at issue in its Intent to Deny, albeit mistakenly. There is no question, however, that there are Class II waters of the State involved at this site and the subject area is within the aquatic preserve and outstanding Florida waters. The Petitioner is charged with knowledge of this inasmuch as the aquatic preserve boundaries are delimited in the Department's above-cited, published rule. In preparing and processing its application and electing to proceed with this project, the Petitioner is charged with knowledge that these are Class II waters and that the water quality criteria and considerations applicable to Class II outstanding Florida waters are the appropriate parameters with which it must comply. In any event, this is a *de novo* proceeding and the Department's initial position with regard to this application is not binding in favor of or to the prejudice of any party to the Section 120.57(1), *Florida Statutes* proceeding.

## IMPACT ON BENTHIC COMMUNITY

9. There is a moderate stand of seagrass at the proposed site of the "T" portion of the dock or waterward end of the dock, with dense seagrass beds existing toward the shore, over which the narrower walkway portion of the dock will traverse. Seagrass beds are an especially productive marine community which contribute greatly to the biological diversity in surrounding waters because of their impor-

171

tant function in the marine food chain. That function is involved with the seagrasses' production of detrital matter consisting of seeds and vegetative material which marine organisms feed upon and upon which organisms larger fish, including commercial and sport fish species, feed upon. Potential adverse impacts caused by a project of this type on the Benthic Community at the project site and especially the seagrass beds involve the potential shading of seagrasses caused by the location of the dock over them, as well as the mooring of boats over them which shading retards or eliminates photosynthesis, which ultimately can kill the seagrass and thus reduce marine productivity in the area. The concentration of boats at such a mooring site as the end of this "T" dock will concentrate the effects of prop scouring, washing and prop dredging, which will have a destructive effect on seagrasses as well as the settling out of sediment from propellor wash or disturbance of the bottom on the seagrasses which can ultimately smother them as well as other marine life forms.

10. In discussing these considerations, it should be pointed out that the "T" portion of the dock would be oriented in a general north-sound direction which causes the shadow of the dock to move rapidly as the sun passes overhead in a general east to west direction. This would tend to minimize the effect of shading on the seagrass of the dock itself, particularly with regard to the approach ramp portion of the dock which is relatively narrow. That portion of the dock extending toward the shore runs in an east to west direction and would not exhibit the same rapidly moving shadow, but the central portion of the approach walkway has been elevated to such an extend that light reaching under the dock from both sides will be sufficient to allow photosynthesis of the seagrasses under the dock, although not for as long a period of the day nor at the same rate as would be the case if the dock were not present.

11. The Petitioner asserts that its voluntary relocation of the "T" shaped portion of the dock from an area of dense seagrass to a moderately populated seagrass bed plus the proposed bow-in mooring of boats so as to alleviate propellor damage to the seagrass, together with its view concerning the prevailing water depth at the end of the dock, will serve to prevent damage to the seagrass at the end of the "T" dock where the boats will be moored. It has been showed, however, that the mooring of boats whether bow-in or otherwise will still create a significant amount of shading of the bottom which, together with the shading caused by the "T" dock as well as the associated finger piers will retard or prevent photosynthesis to some extent, especially where boats are moored for days at a time without

172

moving. This will significantly reduce the marine productivity attributable to the seagrass by retarding its natural function or, in some cases, killing it with the resultant loss of the detrital production as well as carbon production, the former being crucial to the proper functioning of the marine food chain in the area. If the seagrass is damaged or extinguished by the shading effect, prop scouring and washing, and/or settlement of turbidity on the seagrass, or a combination of these factors, not only will its productivity be lost, but the biological diversity of marine life in the area will be reduced as it relates to those vertebrate and invertebrate marine animals which depend on seagrass as a food source either directly or indirectly.

12. Dr. Roessler, for the Petitioner, opined that the attached biological communities or "fouling" organisms such as barnacles which would form on the dock pilings, if they were installed, would provide habitat for marine life and invertebrates and thus enhance the biological diversity of the area. These fouling organisms which attach to pilings, however, represent a very narrow portion of the potential marine biological diversity of life forms in an area such as thus. Their advent on the pilings, should the pilings be installed, would not mitigate for the loss of important marine habitat and resultant species diversity that elimination of this portion of the seagrass beds would pose. Thus, reasonable assurances have not been established that significant adverse impact to the Benthic Community in the form of damage or elimination of the seagrass beds and their dependent biota will not occur due to shading and propellor scouring, dredging and washing occasioned by the installation of the docking facility.

13. Respondent's expert witnesses, Sheftal, Barth, and Dentzau uniformly expressed a concern for propellor scarring, dredging and prop washing of the seagrass beds caused by an improper operation of boats in the project area where water is too shallow over the grass beds to protect them from the resultant propellor damage. In this regard, the Petitioner's own experiments with actual boats indicated that approximately one to 1½ feet of water will remain between the bottom of the sound and the boat propellors at the end of the "T" dock for the general type and size of boats which will use the dock, even assuming that the boats are moored bow inward, thus taking maximum advantage of the deepest water possible under the propellors when a boat engine is started. Respondent's witness Dentzau performed a test with a 21 foot boat with an approximately 100 horsepower outboard engine running it in boat forward and reverse at the "T" end of the dock. He was able to readily generate a "plume" of turbidity consisting of sand and other bottom material suspended in the water by the scouring

173

action of the propellor. Although it was demonstrated for water quality parameter considerations that this turbidity plume did not violate the water quality standards for turbidity, it obviously shows that over time the turbidity suspended by boat propellors will settle on the seagrasses and other bottom-dwelling biota to their detriment and, more immediately important, demonstrates that prop washing and scouring will occur by boats even if moored bow-in at the presently proposed site of the "T" shaped portion of the dock.

14. The Petitioner proposed by the configuration of its "L" shaped dock in conjunction with the "T" shaped dock, as well as with buoy lines, to keep boat traffic away from the dense grass beds surrounding the proposed dock site and over which the walkway will extend. The Petitioner will mark the entrance channel to the marina itself to keep boats from straying over adjacent grass beds. It has not been demonstrated, however, what steps can be taken to effectively prevent boats from approaching the side of the proposed dock around the ends of the buoy lines and over the dense grass beds toward prohibitively shallow water where prop scouring and scarring will occur. Further, although the Petitioner will mark the entrance channel to the marina itself to keep boats from straying over adjacent dense grass beds, the likelihood of propellor damage to the grass beds in the vicinity of the end of the "T" dock has been exacerbated by the concentration of boat traffic which will result by installation of that dock, over waters at the mooring site which are of insufficient depth to protect the grass bed at that location from scouring and washing from boat propellors. In view of these reasons, significant adverse impacts to the Benthic Communities and especially to the grass beds themselves will result by installation of the docking facility at the site proposed, primarily because of insufficient water depth for safe operation of boats in relation to the well-being of the grass beds in the vicinity of the end of the dock and because of the shading which will result by installation of the "T" shaped portion of the dock in conjunction with the boats to be moored to it and the finger piers between the boat slips attached to it.

## WATER QUALITY

15. The Respondent, through its water quality expert witness, Doug Frye, expressed the concern that the proposed project would violate Rule 17-3.051, *Florida Administrative Code,* which requires that the State's waters be free from pollutants above a certain level measured by various accepted and codified scientific methods of measurement. In this regard, the primary concern of the Department is bacteriological quality as well as turbidity resulting from boat operation. The turbidity

174

standards contained in the above Rule provides that State waters not exceed 29 nephelometric turbidity units above the natural background level. The Respondent contends that this level will be exceeded as a result of the operation of boats in the vicinity of the dock. The Petitioner, however, presented a soils analyst and silt settling study which showed that bottom materials in the area involved consist of sand, with some finely pulverized shell and that this material settles very rapidly after being disturbed with little silt remaining in suspension a significant period of time after the disturbance. This is primarily because the level of organics in the bottom substrate is very low at this site.

16. In this connection, the Petitioner's expert witness, Mr. Sheffield, anchored a 16 foot boat with a 40 horsepower outboard motor in the docking area of the proposed project. He operated the boat at 1,000 RPM for an extended period of time while measuring the resultant turbidity. The results of his measurements showed turbidity to be in the range of 5-11 NTUs. The Respondent's witnesses, however, operated a larger 21 foot boat at the location of the "T" shaped portion of the dock maneuvering it back and forth with a fairly large outboard motor in the 100 horsepower class, which might be presumed to be typical of the boats which will be using the proposed facility. The maneuvering of the boat with the larger engine in this shallow water created a clearly visible plume of turbidity shown by photographs introduced into evidence by the Respondent. In fact, however, although the turbidity plume was clearly visible, the Respondent's own direct measurement of turbidity taken from within the plume immediately after it was generated was 23.8 NTUs, still below the State standards for violations as to turbidity.

17. The existing marina facility has a fuel dock and has adopted a fuel spill contingency plan. There will be no fueling of boats nor fuel kept at the proposed docks. Nevertheless, marinas were established to be a known source of discharge of oils and greases and the presence of more boats utilizing all the dock facilities, especially during fueling and maintenance procedures, will result in additional oils and greases being deposited in the water. Even if there is no fueling facility planned for the proposed docks, the additional boats represented by the 25 additional slips sought to be approved will have to be fueled and likely at the existing facility. This will heighten the risk of fuel, oil and grease spills. In this regard, it must be remembered that the present marina and the proposed docking facilities are in outstanding Florida waters in which no degradation of ambient water quality is permitted. In this context then, the Petitioner/Applicant has not provided reasonable

**175**

assurances that pollution levels for oils and greases will not increase as a result of the potential addition of 25 boats to this marina facility.

18. A substantial issue has been raised in this proceeding concerning water quality as it relates to the bacteriological standard. It has been established that this marina is presently a source of discharge of fecal coliform organisms which frequently are present in sufficient concentrations so as to violate the standard for that organism for Class II waters. Fecal coliform bacteria are accumulated in the bodies of shellfish. The shellfish themselves are not harmed, but contaminated shellfish can accumulate concentrations of as much as 100 times the ambient fecal coliform bacterial levels present in the waters they inhabit. Fecal coliform bacteria can cause extreme illness in human beings, sometimes even paralysis and death. Fecal coliform bacteria in State waters results from the deposition therein of human or animal waste. The Petitioner maintains a sewage pumpout station located at its fuel dock with a direct connection to its sanitary upland sewer system, as well as a portable sewage pump that can be moved to each boat slip for pumping out of toilets or "heads" on boats. Upland fish cleaning stations will additionally be provided with the proposed docks so as to prevent refuse from fish cleaning activities being deposited into the waters of the cove. The fact remains, however, that there presently exist high levels of fecal coliform organisms in the waters of the cove at the marina site, in the above noted violative concentrations on repetitive occasions. The presence of boats moored in the marina with "heads" aboard are a known discharge source of fecal coliform organisms. The Petitioner proposes to restrict boats using the facility to those boats without marine heads aboard or requiring those with heads to keep them locked or otherwise not discharge them into the waters of the marina. If boats utilizing the marina have toilets aboard, however, there is a substantial likelihood that at some point those toilets will be discharged into the waters of the cove before any of the Petitioner's monitoring personnel are aware of it. The problem is thus one of enforcement. In this regard, it is established that even without the sewage pumpout station and the portable sewage pumpout device, that there are a number of "live-aboard" boats with marine heads in the marina at the present time and customarily. This has caused the above found violations of fecal coliform, Class II water standards. Although the Petitioner proposes to restrict boats at the proposed docking facility to those less than 25 feet in length and to establish a monitoring program by the marina management personnel to assure that the boats with heads only contain heads approved by Coast Guard regulation, reasonable assurances have still not been established that the enforce-

176

ment plan proposed can be effective in ensuring that no marine heads or other sources of coliform bacteria will be discharged into the waters of the cove at the project site. The plan proposed by the Petitioner simply did not ensure that boats having marine heads will not use the marina and that those persons using boats so equipped will not, on some occasions, discharge the heads into the waters of the marina at the project site nor that spills will not result in the sewage pumping-out process.

19. The Respondent's expert witness, Mr. Porter, confirmed that most fishing boats of the open "center console" variety of 25 feet length or less do not contain marine heads, nevertheless, he established that in his experience monitoring marinas of this sort, the restrictions against marine heads of the non-approved variety and the attempted restriction against boats discharging the contents of their heads into the waters of the marina cannot be effectively enforced nor was it established that fishing boats without marine heads will be the only type of boat to use the proposed docking facilities. Accordingly, the waters of the cove at the marina site and project site are in frequent violation of the fecal coliform and total coliform parameter for Class II waters and reasonable assurances have not been provided that the fecal coliform bacterial levels will not increase as a result of the installation and operation of the proposed facility with its attendant boats.

20. Because of the likelihood of shellfish contamination by fecal coliform bacterial levels which will likely increase if the proposed project is constructed and operated, together with the loss of marine habitat and productivity posed by the harm likely to result to the seagrass beds in the vicinity of the proposed facility due to attendant boat operation, it has been shown that the water quality parameter for biological integrity in these Outstanding Florida Waters will likely be degraded. The "Diversity Index" of marine microinvertebrates in the area of the affected seagrass beds will likely be reduced below 75 percent of background levels. Therefore, in the context discussed above, the proposed construction and operation of the 25-slip marina facility with the "T" dock will lower ambient water quality in these outstanding Florida waters and will result in violations of State water quality standards for Class II waters in the above particulars.

## SHELLFISH HARVESTING

21. Mr. William Porter of the Department of Natural Resources Bureau of Shellfish Sanitation established that the cove where the project would be located is closed to the taking of shellfish as a result of the contamination or potential for contamination of shellfish by

177

coliform bacteria contained in fecal material. His Department's water quality sampling confirmed the elevated levels of fecal coliform bacteria in the cove on repetitive occasions. This elevated level of coliform organisms was shown to result from improper operation of marine toilets upon vessels using the marina at the present time. Because of the potential for contamination from vessels discharging fecal material, Mr. Porter established that the Department would likely close an area 50 percent larger than the present shellfish harvest closure area as a result of a 50 percent increase in the number of boats capable of using the marina if the proposed project is built. Mr. Porter acknowledges that if it could be assured that boats using the marina did not contain heads, the increased area of closure might be lessened after this project were built. He also established as pointed out above that such restrictions on boats containing heads from using the proposed boat slip is very difficult to enforce. Even with the present central sewage pumpout facilities and portable pumpout equipment at the existing marina, the marine still has failed to comply with fecal and total coliform standards for Class II waters on a repetitive basis. The management of the present marina has allowed live-aboard boats at the marine even though it has posted warning signs against boat owners discharging toilets in the cove waters.

22. Mr. Porter also acknowledged that the Boca Grande North Marina, owned by Gasparilla Pass, Inc., was recently permitted by the DER and constructed and has not yet resulted in the Department's closing an additional area to the taking of shellfish. The area the marina is situated in, however, is only "conditionally approved" for the taking of shellfish, meaning that it is subject to closer monitoring by the DNR with a view toward the possible necessity of closing waters in the area of that marina. It was not established, however, how the fecal coliform or total coliform levels in the waters adjacent to that marina compare to the existing marina or the site of the proposed docking facilities at the existing marina, nor what conditions might prevail which would render that other maring a comparable site to be used as a relevant demonstration of what conditions might be expected at the present marina if the proposed project were built and operated.

23. Thus it has been shown that even though the Petitioner proposes limiting the size of boats at the proposed facility and closely inspecting and regulating any marine heads on boats using the facility to make sure they comply with Coast Guard regulations, it has not been demonstrated that the additional deposition of fecal coliform bacteria in the waters of the cove will be adequately prevented by the proposed enforcement measures. It is thus reasonably likely that the construction

178

of the proposed project will lead to the closing of an additional area of water which is presently approved for shellfish harvesting. The closure of shellfish harvesting in waters is contrary to the public interest in terms of recreational values, fishing and marine productivity and others of the seven public interest criteria quoted below. Further, the contamination of shellfish, which can cause severe illness or even death in human beings, is clearly contrary to the public interest and there is a substantial likelihood that shellfish contamination is already occurring in the area due to the characteristic of shellfish by which they accumulate or store fecal coliform organisms to reach injurious levels for human consumption even though the shellfish themselves appear to be healthy. The area of the proposed project is extensively used for commercial and recreational shellfish harvesting at the present time, outside the immediate closed waters of the marine within the cove.

## PUBLIC INTEREST

24. Section 403.918(2)(a)(1-7) requires that the Petitioner provide reasonable assurances that the proposed project will be clearly in the public interest. The public interest considerations of those seven criteria concern whether the project will adversely affect public health, safety or welfare or property of others; whether it will adversely affect conservation of fish and wildlife or their habitats; whether it will adversely affect the fishing or recreational values or marine productivity in the project vicinity; whether it will be of a temporary or permanent nature; and the effect on the current condition and relative value of functions reformed by areas affected by the project.

25. Although Petitioner's witness, Dr. Roessler, related that the attached fouling communities, such as barnacles, which would form on the proposed docks and pilings would increase the diversity of marine habitat available, that will not offset the loss of marine habitat occasioned by the increasingly detrimental effect imposed by the project and the operation of it on the seagrass beds, in the manner discussed above. The fouling communities expected by Dr. Roessler to occur on the pilings to be installed, will not provide, nor replace the value of, the detritus (seeds and leaves) produced by the seagrass which would be lost, which is an important food source for marine organisms in the upper portion of the food chain in the area, some of which organisms include fish and have a high recreational value and commercial value. The importance of detrital production by the seagrass beds outweigh the value of the addition of the fouling communities on the pilings. In fact, the total diversity of marine species actually might decline even though the fouling organisms would be added with the installation of

**179**

the pilings, once the harmful effects on the seagrass beds begin to occur after installation and operation of the proposed facility and over the life of the marina. Thus, in this regard, the project is contrary to the public interest and certainly not clearly in the public interest.

26. Additionally, there is a substantial likelihood that shellfish may be contaminated which, in turn, will have an adverse effect on the public health, safety and welfare. The harvesting of shellfish has a substantial recreational and commercial value and is an important aspect of the marine productivity in the vicinity of the project. The heightened coliform bacteria production caused by the resultant expansion of the marina will adversely affect fishing and recreational values and marine productivity and will degrade the current condition and relative values of the functions performed by the marine habitat in the vicinity of the proposed dock. Finally, there is no question that the project will be of a permanent nature.

27. The various detrimental effects on the public interest consideration found herein are rendered more critical by the fact that there is no truly redeeming public purpose or use for this project. This will be essentially a private docking facility designed to serve the residents of the applicant's attendant real estate development. The upland development is a condominium development and the slips will be owned by the condominium owners and not open to the general public, although the Petitioner did make vague reference to an idea that some slips might be rented to members of the public. This was not established to be the case and, in any event, the primary purpose of the boat slips is to enhance the desirability of the upland development.

28. Although the Petitioner emphasizes that the advent of the additional slips might help attract as much as $1,000,000 additional revenue to the Boca Grande area by assisting the applicant in hosting the Annual Tarpon Release Fishing Tournament, it is also true that any development in a coastal area will likely represent some economic benefit to that area, but there is also a substantial economic and recreational benefit to maintaining the outstanding Florida waters involved in an undergraded condition and maintaining the present Class II, approved shellfish harvesting area unimpaired. Thus, although the proposed docks might be used for sponsorship of the subject fishing tournament and it can be said that that would enhance fishing and recreational value to some extent, it was not established that the tournament will not occur and that the extra revenue and enhancement of fishing and recreational value it will generate will not occur in the Boca Grande area anyway. The potential detrimental effects of the proposed project, delineated above, will also decrease fishing and

180

recreational value over many years and for the life of this project in terms of harm to the marine habitat occasioned by the constant deposition of oils, greases and fuel and coliform bacteria in the Class II waters involved, as well as the other detrimental aspects of the project discussed above. It has not been established that the economic benefits of the fishing tournament and the addition of the boat slips will not occur but for the installation of this proposed docking facility. Although it may help relieve a shortage of marina slips in the area, it was not shown that this is the only alternative to relief of that shortage.

## ALTERATION OF MANGROVES

29. The original site for the access ramp or walkway to the "T" shaped portion of the dock was selected through an on-site inspection conducted in party by Respondent's witness, Andrew Barth. The mangrove area is less dense at the site of the walkway's penetration of the mangrove belt than surrounding mangrove areas. Petitioner's witness, Dr. Roessler, has participated in many studies involving mangroves in South Florida. He identified each tree within the proposed dock pathway. Through narrowing of the dock walkway to five feet and the relocation agreed upon by the Petitioner and Mr. Barth, it has been established that only three mangrove trees will be removed by the construction of the dock. Thus, there will be no substantial alteration or degradation of the mangrove fringe area at the project site.

## DOCK CONSTRUCTION

30. Mr. C. W. Sheffield was accepted as an expert witness in the field of marine engineering. He established that the pilings will be installed using a 6 to 8 inch chisel point driven into the bottom of the sound with an air hammer. There will be no augering or other means of excavation used which would generate a substantial amount of turbidity. The air hammer will result in compaction of sediments by forces radiating out from the piling as it is driven, with the counteracting sheer force caused by the piling installation causing a slight bulging in the bottom around each piling, but nothing more. There will be no significant movement of sediment in the water column. The construction of the dock will take place moving from the land waterward, utilizing equipment mounted on the dock. Thus, construction barges will not be required to come into the shallow grass bed area with the potential for its damage. Small barges would be used in the deeper waterward portions of the project to install the mooring pilings offshore from the end of the "T" dock. Turbidity curtains will be used during all construction, surrounding all phases of the construction

**181**

work. In Mr. Sheffield's experience, such measures have resulted in no violation of the State turbidity standards at other similar projects, and are not likely to with this one.

## CUMULATIVE IMPACT

31. A number of permits have been issued by the Department for docking facilities to the north of this proposal and other facilities are already in existence. Dr. Roessler opined that the geographic location of these, as well as that of this project, in light of the numerous inlets and high degree of tidal flushing and exchange through the inlets, will not result in any adverse cumulative impact occasioned by the addition of the proposed dock with 25 slips to those already existing in the Sound. It is noteworthy that, with regard to the potential this project poses for damage to the seagrass beds and for heightened production of fecal coliform bacteria, with the environmental damage attendant thereto, no proof was offered by either party concerning those considerations or effects to the extent that they might or might not exist at other marinas or docking facilities in the Gasparilla Sound area. There has been no proof to establish any cumulative impact.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction of the parties to and the subject matter of this proceeding. Subsection 120.57(1), *Florida Statutes* (1985).

Section 403.91-403.929, *Florida Statutes,* otherwise known as the "Warren S. Henderson Wetlands Protection Act," provides the Department with the authority to require a dredge and fill permit for the installation of dock pilings, docks and the operation of a marina within waters of the State. Section 403.918(1) and (2) sets forth a two part test that an applicant must meet in order to establish that a dredge and fill permit should be issued. Subsection (1) provides that a permit may not be issued unless an applicant provides reasonable assurance to the Department that water quality standards will not be violated. The standard prevailing herein are those contained in Chapter 17-3, *Florida Administrative Code,* related to Class II waters of the State. Further, Rule 17-4.242, *Florida Administrative Code,* pertaining to outstanding Florida waters provides that an applicant must demonstrate that the proposed activity or discharge is clearly in the public interest and that the existing ambient water quality within the outstanding Florida waters (here the Gasparilla Sound Aquatic Preserve) will not be lowered as a result of the proposed activity or discharge, other than on a temporary basis during the period of construction. Subsection

182

403.918(2), of course, also provides that a permit may not be issued unless the applicant has reasonable assurances that the project, if in outstanding Florida waters, will be clearly in the public interest. Section 403.918(1) and (2)(a)(1-7) provide in pertinent part as follows:

"Criteria for granting or denying permits.—

(1) A permit may not be issued under ss. 403.91-403.929 unless the applicant provides the department with reasonable assurance that water quality standards will not be violated. The department, by rule, shall establish water quality criteria for wetlands within its jurisdiction, which criteria give appropriate recognition to the water quality of such wetlands in their natural state.

(2) A permit may not be issued under ss. 403.91-403.929 unless the applicant provides the department with reasonable assurance that the project is not contrary to the public interest. However, for a project which significantly degrades or is within an Outstanding Florida Water, as provided by department rule, the applicant must provide reasonable assurance that the project will be clearly in the public interest.

(a) In determining whether a project is not contrary to the public interest, or is clearly in the public interest, the department shall consider and balance the following criteria:

1. Whether the project will adversely affect the public health, safety, or welfare or the property of others;

2. Whether the project will adversely affect the conservation of fish and wildlife, including endangered or threatened species, or their habitats;

3. Whether the project will adversely affect navigation or the flow of water or cause harmful erosion or shoaling;

4. Whether the project will adversely affect the fishing or recreational values or marine productivity in the vicinity of the project;

5. Whether the project will be of a temporary or permanent nature;

6. Whether the project will adversely affect or will enhance significant historical and archaeological resources under the provisions of s. 267.061; and

7. The current condition and relative value of functions being performed by areas affected by the proposed activity.
. . ."

The Petitioner contends that the Department is precluded from

**183**

requiring a permit for the placing of the pilings and construction of the dock thereon because the rule defining the placing of pilings in waters of the State to be "filling" post-dated the completion of the application at issue and cannot be applied retroactively. The rule defining dock piling as "materials" became complete and adopted on March 18, 1986. See Rule 17-12.030, 17-4.020(15) and 17-4.020(16). Even if one accepts the Petitioner's argument that the above rule concerning the requirement for a permit is substantive and cannot be given retroactive effect, the fact remains that in the Statute at issue itself, in the definitions portions set forth at Section 403.911(4), *Florida Statutes,* which was effective for applications completed subsequent to October 1, 1984, as was this one, the term "filling" means the deposition by any means of *materials* in waters. It would seem that the term "materials" can clearly mean pilings and one must presume that had the Legislature intended to restrict the term "materials" to soil, dirt, rock, shell, sand or the like, it would have done so rather than left the term by which filling is defined as inclusive of a broad category of substances which can be placed in State waters.

Be that as it may, the Department as long followed a policy of defining the placing of pilings in State waters as either constituting "dredging" or "filling," but consistently requiring the subject type of permit, prior to the decision in *Gar-Con Development, Inc. v. Florida Department of Environmental Regulation,* 468 So.2d 413 (Fla. 1st DCA 1985), rehearing denied, 479 So.2d 117 (Fla. 1985). The DER in that case took the position that the construction of a docking facility was prohibited by the provisions of Chapter 17-4.28(8), *Florida Administrative Code,* which prohibited dredging or filling in waters approved for shellfish harvesting. The Court concluded in that case that DER's prior policy of classifying pilings as fill, as well as its then-present policy of classifying the installation of them as dredging, an invalid policy as having the general applicability of law without having been adopted by rule-making. Immediately after that decision, therefore, the Department asserted that the driving of pilings was filling and instituted rule-making which resulted in the adoption of the above-cited rule.

Thus, the Department's position before and after the adoption of that Rule was that a permit was required, whether one calls the driving of pilings dredging or filling. The point is that the Department required a permit for placing of pilings in State waters before and afted the adoption of the rule and its adoption did not change the substantive requirement in the Department's policy that a permit was required regardless of how pile-driving was defined. No new requirement was

184

added. The rule merely clarified what the statute said all along. Thus, it would seem that *Turro v. DHRS,* 458 So.2d 345 (Fla. 1st DCA 1985), is applicable here and that the rule adopted prior to this hearing, even though it is after the proceeding commenced, which defines the placing of pilings in State waters as "filling" for purposes of the above statute, and dictates that a permit is required for such activity, applies here. It adds no new substantive requirement of which the Petitioner was unaware before the proceeding commenced, given the statute itself and the Department's past policy of requiring a permit.

Further, it was established that the Department adopted incipient agency policy following the decision in the *Gar-Con case, supra,* and before the rule adoption, to the effect that the installation of pilings in State waters constitutes filling. The Department established, through its proof at hearing, that this policy was supported by rational, scientific fact within the area of the Department's expertise as shown by the testimony of witness Douglas Frye. This policy was adopted by the Department with the intention of immediately adopting rule-making defining dock pilings as "materials" for purposes of the above-quoted statutory provision, thus making the installation of pilings filling. The rule was then duly adopted. See, generally, *MacDonald v. Department of Banking and Finance,* 346 So.2d 569, 581 (Fla. 1st DCA 1977).

Be that as it may, Section 403.987, *Florida Statutes* (1985), provides that:

"(1) No stationary installation which will reasonably be expected to be a source of air or water pollution shall be operated, maintained, constructed, expanded, or modified without an appropriate and currently valid permit issued by the department. . ."

Thus, even if the Petitioner established that installation of dock pilings in waters of the State was not dredging or filling, the Respondent would still have the legal authority to require a permit for the construction of docking facilities of the type proposed herein pursuant to this statutory provision. There is thus no question that the Department has jurisdiction to require a dredge and fill permit for the activity involved in the instant permit application and proceeding.

The proposed project is located within the waters of Gasparilla Sound, Charlotte Harbor Aquatic Preserve, an outstanding Florida water. See Section 258.392, *Florida Statutes* (1985); Section 403.061(27), *Florida Statutes;* Rule 17-3.05(4), (8), *Florida Administrative Code.* The proposed project is also located within Class II waters of the State, closed to shellfish harvesting. See Section 403.061(29),

*Florida Statutes* (1985). Rule 17-4.28(8)(a) and (b) recognizes the special value and importance of Class II waters to Florida's economy as existing and potential sites of commercial and recreational shellfish harvesting, as well as nursery areas for fish and shellfish; therefore, it is the Department policy to deny permits or certification for dredge and fill activities in Class II waters except where a plan or procedure has been submitted by an applicant which shows adequate protection in the project area from damage to these resources.

At Subsection (b) of the Rule, it is provided:

"The Department shall also deny application for permit certification for dredging and/or filling activities in any class of waters where the *proximity* of such activities to Class II waters would be expected to have an impact on Class II waters, and where reasonable assurance has not been provided that the activities will not result in violations of the applicable provisions of Chapter 17-3, *Florida Administrative Code,* in the Class II waters." (Emphasis supplied)

The Respondent has established through its expert testimony and water quality data that the proposed project will likely lower the ambient water quality in the outstanding Florida waters involved and will violate the Class II water quality standard for fecal coliform and total coliform organisms. The violation of Class II water quality standards for coliform organisms will likely also result in additional waters adjacent to the cove, which is already closed to shellfish harvesting, being closed as well. This would violate the requirements of the Rule quoted last above and would in itself be grounds for denial. Further, the likelihood of violation of fecal and total coliform standards, in addition to requiring denial of the sought permit pursuant to the above rule, also shows that the project will not be clearly in the public interest.

Pursuant to Subsection (2) of Section 403.918 quoted above, the applicant must provide reasonable assurance that the project will be *clearly* in the public interest inasmuch as these are outstanding Florida waters involved in the area of the project. Specifically, the violation shown to likely occur of Class II water quality standards, which will in turn likely result in additional waters adjacent to the marina being closed to shellfish harvesting, is deemed to adversely affect the public health, safety or welfare by precluding shellfish recreational or commercial harvesting and posing the danger of rendering the shellfish in the adjacent waters unsanitary and dangerous to human health. This eventuality will clearly adversely affect the fishing and recreational values and the marine productivity in the vicinity of the project as well

186

and obviously the project will be of a permanent nature. It will degrade the current condition and relative value of the functions being performed by the areas affected by the proposed activity for purposes of criteria number seven of Section 403.918(2)(a), *Florida Statutes,* because it will reduce the available area and therefore the value of the shellfish fishery in Gasparilla Sound. Thus, the violation of the Class II water quality standards which is already occurring and which will be exacerbated by the proposed addition of the docking facilities and the additional boats, with attendant environmental damage referenced above, demonstrates that reasonable assurances that the proposed project will be clearly in the public interest have not been established.

The Resondent has also established that the proposed project will degrade and destroy the seagrass beds in the vicinity of the "T" dock and approach areas for boats to such an extent as to be contrary to and not clearly in the public interest by adversely affecting the conversation of fish and wildlife habitat in this particular, the current condition and relative value of this resource, as well as adversely affecting the fishing, recreational values or marine productivity in the vicinity of the project because of the lost value of the grass beds to the marine food chain and therefore the production of commercial and recreational fish and other marine life. Concerning Section 403.918(2)(a)(5), the proposed project will be permanent in nature and thus the adverse effects will last indefinitely and worsen with time due to the continuous discharge of oils and greases and the continuous, deleterious effect of boat operation on the marine habitat in the area. Thus, as to this provision as well, the project will not be clearly in the public interest.

Further, with regard to the water quality criteria of Rule 17-3.121, *Florida Administrative Code,* and Section 403.918(1), reasonable assurances have not been established that the project will not reduce biological integrity. In fact, the Respondent established that the project will reduce biological integrity by reducing the diversity index of Benthic microinvertebrates to less than 75 percent of established background levels as a result of the destruction and degradation of the seagrass marine habitat involved during both construction and operation of the facility over an ensuing long period of time.

In addition to the deposition of fecal coliform and total coliform organisms into the waters of the marina in violation of the Class II water quality standards contained in Chapter 17-3, *Florida Administrative Code,* the proposed project is reasonably expected to result in discharge of fuel, oils and greases into the surface waters of the marina at the project site by boats motoring around the docks over the life of

187

the marina, so as to lower ambient water quality. This will thus violate Rule 17-3.051, *Florida Administrative Code,* and particularly Rule 17-4.242(1)(a), (b), *Florida Administrative Code,* pertaining to outstanding Florida waters.

Finally, in view of the failure to show that the project is clearly in the public interest for the reasons enumerated above and in the context of the various criteria under Section 403.918(2)(a)(1-7), *Florida Statutes* (1985), it should be pointed out that the Petitioner failed to propose any measures designed to mitigate the adverse effects which may be caused by the project for purposes of Section 403.918(2)(b), *Florida Statutes.* As discussed above, the biological communities or "fouling organisms" which may attach to the proposed dock pilings will not constitute mitigation for the likely loss of the seagrass habitat which the project will cause. The fouling communities do not provide significant habitat for marine organisms and no detrital production for the higher forms of marine organisms such as fish. In any event, they are a natural, minor consequence of installation of the project and not an affirmative, independent means of off-setting its ill effects proposed and undertaken by the applicant such as would be the case with seagrass replanting, for example.

In summary, for the above reasons, the Petitioner failed to provide reasonable assurances that the project will not lower ambient water quality in these outstanding Florida waters nor did it provide reasonable assurances that the project will be clearly in the public interest. The adverse effects to marine productivity, conservation of fish and wildlife and their habitats, and the other ill effects enumerated above which will result from the advent of the project outweigh any benefits inuring to the public and to the local community from the project. Except for the proposed "L" shaped dock and six slips which was unopposed and should be granted with the above-delineated, agreed-upon conditions, it is therefore concluded that the Petitioner did not comply with the above authority and that the application should be denied.

## RECOMMENDATION

Having considered the foregoing Findings of Fact and Conclusions of Law, the testimony and evidence of record, the candor and demeanor of the witnesses, and the pleadings and arguments of the parties, it is, therefore

RECOMMENDED that a Final Order be entered denying the subject permit application, except for that portion seeking authorization for the "L" shaped dock and six boat slips attendant thereto, which

188

should be granted with the agreed-upon conditions and restrictions contained in the above Findings of Fact.

DONE and ENTERED this 19th day of December, 1986 in Tallahassee, Florida.